IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARA MACCHIA,<br><br>                             Plaintiff,<br><br>- against -<br><br>AUTOMATIC DATA PROCESSING, INC., d/b/a ADP,<br><br>                             Defendant. | Case No. 21 Civ. 1502 |

## COMPLAINT

Plaintiff Cara Macchia, by and through her attorneys, Kessler Matura P.C., complaining of Defendant Automatic Data Processing, Inc. d/b/a ADP ("ADP"), alleges as follows:

### PRELIMINARY STATEMENT

1. Cara Macchia is a 31-year-old woman.

2. Ms. Macchia worked at ADP from February 2015 until June 26, 2020.

3. Ms. Macchia was a high performing employee who was promoted twice during her tenure at ADP.

4. However, once Ms. Macchia informed ADP of her pregnancy, ADP began a campaign of discrimination against her resulting in her termination.

### NATURE OF THE CLAIMS

5. Plaintiff seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendant's unlawful employment practices in violation of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and New York State Human Rights Law, N.Y. Executive Law §§ 290, *et seq.* ("NYSHRL").

## ADMINISTRATIVE PROCEDURES

6. Plaintiff filed a Charge of Discrimination with the EEOC against Defendant.

7. Plaintiff received a Notice of the Right to Sue from the EEOC on January 14, 2021.

## JURISDICTION AND VENUE

8. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII.

9. The Court has supplemental jurisdiction over Plaintiff's related claims arising under State law pursuant to 28 U.S.C. § 1367(a).

10. Venue is proper in this County pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the majority of the unlawful employment practices alleged herein, occurred in this district.

## THE PARTIES

*Plaintiff Cara Macchia*

11. Plaintiff is resident of the County of Suffolk, State of New York.

12. At all times relevant, Ms. Macchia was employed by Defendant.

13. At all times relevant, Ms. Macchia was an "employee" within the meaning of all relevant statutes.

*Defendant ADP*

14. ADP was and still is a corporation, organized and existing pursuant to the laws of the State of Delaware.

15. ADP was and still is still a corporation, organized and existing pursuant to the laws of the State of New York.

16. ADP's principal place of business was and still is in New Jersey.

17. ADP was and still is authorized to do business in the State of New York.

18. ADP was and still is doing business in the State of New York.

19. ADP was and still is doing business as ADP in the State of New York.

20. ADP was and still is doing business as ADP LLC in the State of New York.

21. ADP was and still is doing business as ADP Inc. in the State of New York

22. ADP was and still is an "employer" within the meaning of all relevant statutes.

## FACTS

23. Ms. Macchia informed ADP of her pregnancy in February 2019.

24. After Ms. Macchia informed ADP of her pregnancy, her manger, Vice President of Sales, Meghan Hinck ("Hinck") began taking unwarranted disciplinary actions against Ms. Macchia and treating her differently than her non-pregnant co-workers.

25. In the office, Hinck was vocal about her displeasure with pregnant employees and their requests for accommodations.

26. Hinck made disparaging remarks about pregnant workers in front of Ms. Macchia and ADP employees Shannon Malone, Sean Blau and Kerry Farrell. For example, Hinck stated that pregnant administrative assistant Tatum Minerva "screwed over" the office by taking disability leave for her pregnancy related sciatica pain.

27. Ms. Minerva and Ms. Macchia announced their pregnancies to ADP management around the same time and Hinck repeatedly complained about Ms. Minerva's pregnancy causing problems for the office throughout Ms. Macchia's pregnancy.

28. This open hostility towards pregnant women's health and right to be accommodated made Ms. Macchia very anxious at work and wary of Hinck.

29. On March 21, 2019, Hinck and Macchia met to plan for the upcoming quarter.

30. During this meeting Hinck mentioned that Ms. Macchia's maternity leave was inconvenient for ADP and that it would be difficult for Ms. Macchia to return to work during the highest quota months of the year.

31. Ms. Macchia and Hinck discussed different ways that she might be able to leverage business from her Certified Public Accountant ("CPA") partners.

32. At the conclusion of the meeting, Ms. Macchia told Hinck that she looked forward to implementing the ideas they had discussed.

33. Approximately one week after the March 21, 2019 meeting, Ms. Macchia received a calendar invite for a follow up meeting, scheduled for April 1, 2019.

34. The timing of the follow up meeting was odd and premature, as there had not been enough intervening time to implement the items discussed at the March 21, 2019 meeting.

35. At the April 1, 2019 meeting, Hinck and Sales Executive Kerry Farrell ("Farrell") informed Ms. Macchia that ADP was placing her on a performance improvement plan ("PIP").

36. Ms. Macchia was alarmed and confused that ADP elected to take this disciplinary action against her.

37. Ms. Macchia's performance was far superior to the performance of several of her colleagues who had not been subjected to any disciplinary measures.

38. Other employees in Ms. Macchia's office consistently failed to meet performance benchmarks and had not been placed on a PIP, including several employees in her office who had missed quotas for several consecutive months, regularly fell short of fiscal year goals and did not achieve promotions.

39. In addition to placing Ms. Macchia on a PIP, Hinck made a remark during this meeting that indicated that the PIP was only a formality and that Hinck ultimately planned on terminating Ms. Macchia.

40. When Ms. Macchia asked about the stark difference in treatment between herself and her frequently underperforming, non-pregnant coworkers, management informed her that there was no policy in place concerning when an employee would be placed on a PIP.

41. Hinck structured the timing of the PIP to prevent Ms. Macchia from achieving her targets and to portray a misleading snapshot of Ms. Macchia's contributions at ADP.

42. The PIP began in April 2019. As a CPA centric representative, Ms. Macchia's sales opportunity comes from CPA referrals. Thus, the height of tax season in April is a notoriously difficult month for CPA centric representatives to meet sales quotas.

43. In addition, Ms. Macchia was scheduled to go on a previously requested and approved week-long vacation starting April 4, 2019, and thus the number of days that she would have to reach her new target would be reduced by 25%.

44. Ms. Macchia brought her concerns to Hinck and Farrell, and asked if her PIP could begin in May, however, they refused.

45. On April 29, 2019, Ms. Macchia met with Farrell as part of a region wide "lift and shift."

46. The purpose of the meeting was for CPA centric representatives to give up a list of 15 CPA firms and to state their preferences for the firms that they would be receiving in return.

47. Farrell told Ms. Macchia that she would receive her new CPA firms on or before the start of ADP's new fiscal year, which begins on July 1.

48. Throughout the months of May and June, Hinck continued to make negative remarks about Ms. Macchia's projected return from maternity leave, constantly referencing the fact that it would be very difficult for her to return to work during high quota months.

49. On July 3, 2019, when Ms. Macchia was nine months pregnant and preparing to go on maternity leave, Hinck informed Ms. Macchia that she was putting her on written warning because the PIP, "clearly wasn't working."

50. Hinck then informed Ms. Macchia that if she missed her quota for two consecutive months she would be fired.

51. Ms. Macchia asked for clarity on how this warning period would work with her upcoming maternity leave and asked specifically, "if I miss the month of July, go into labor in August, then return to work in December, I could be fired the next month?"

52. Hinck responded, "Yes, that's exactly what would happen."

53. On July 11, 2019, Ms. Macchia met with Farrell and inquired about the CPA client list that she was supposed to receive in exchange for the 15 CPAs that had been removed from Ms. Macchia as part of the "lift and shift."

54. Farrell informed Ms. Macchia that she was not going to receive any new CPAs until she returned from maternity leave. Farrell told Ms. Macchia that "there was no point in giving you new CPAs."

55. Ms. Macchia immediately recognized that by withholding CPAs, Farrell was directly affecting her ability to meet her quota, comply with her PIP, and avoid termination.

56. Ms. Macchia told Farrell that she was going to speak with human resources because her managers were explicitly stating that they were treating her differently than her coworkers because she was pregnant and taking maternity leave.

57. Later that day, Ms. Macchia called and emailed ADP's human resources department and was told that she would not be able to speak with anyone until July 15.

58. On July 16, 2019, Ms. Macchia spoke with human resources representative Ann Marie Vargas ("Vargas").

59. During the call with Vargas, Ms. Macchia explained the events described above and told Vargas that she was being discriminated against because she is pregnant.

60. Vargas told Ms. Macchia that she would consult with her supervisor and get back to her.

61. On July 17, 2019, Vargas emailed Ms. Macchia and referred her to ADP employee relations representative Hanna Yurkovetskaya ("Yurkovetskaya").

62. Ms. Macchia told Yurkovetskaya about how Hinck and Farrell had been discriminating against her since she announced her pregnancy.

63. Ms. Macchia also detailed how her supervisors' discriminatory actions over the past several months had caused her severe mental and physical distress.

64. Yurkovetskaya told Ms. Macchia that she would investigate and that she had placed her written warning on hold.

65. On July 22, 2019, Ms. Macchia's doctor told her that she should work remotely for the rest of her pregnancy. Later that evening, Ms. Macchia received an after-hours call from Hinck stating that the situation had "gotten ugly."

66. On the call, Hinck lied to Ms. Macchia and stated that she had asked human resources to hold off on applying the written warning.

67. Two days later, on July 24, 2019, Ms. Macchia went into labor.

68. Despite going into labor and giving birth in July 2019, Ms. Macchia exceeded her quota for the fiscal month of July.

69. ADP's discriminatory actions continued after Ms. Macchia returned from maternity leave and ADP began to engage in retaliation.

70. Despite being appraised of Ms. Macchia's return date, when she returned to work none of the technology that she need to perform her job was functioning.

71. The technology remained inoperable throughout the first week that she was back from maternity leave.

72. The technology was not repaired until December 20.

73. When Ms. Macchia returned to work, she discovered that some of the associates who were covering her clients in her absence were operating as though she would not be returning to work after her maternity leave.

74. Post-maternity leave, Ms. Macchia had less CPAs in her "opportunity" (this is an ADP term for lead sources) than she had throughout her tenure with ADP, however she was still expected to meet the same sales quota.

75. When she returned back to work from maternity leave in December 2019, no one informed her about how the warning process would proceed.

76. Instead, when she asked Farrell about her status, Farrell gave a vague response.

77. Farrell told Ms. Macchia that she would not be expected to hit the highest quota months of the year upon her return.

78. On January 24, 2020, Plaintiff's attorney sent a letter to ADP detailing ADP's discriminatory and retaliatory behavior.

79. Since the conversation with Farrell upon her return to work in December 2019, Ms. Macchia was not contacted about her alleged poor performance, company expectations, or what the warning process would look like moving forward—until she was put on final warning on June 1, 2020.

80. In this final warning ADP stated that Ms. Macchia had missed her quota five out of the prior five months.

81. Two of the five months were January 2020 and February 2020, which Farrell explicitly acknowledged that Ms. Macchia would not have been able to hit quota after having been out on maternity leave and not having a pipeline of business built up.

82. Moreover, unlike other associates in the Long Island region, Ms. Macchia had never been given back the CPAs that were removed from her during the "lift and shift," therefore, she was at a significant disadvantage in her attempts to reach quota.

83. The other three months that ADP states Ms. Macchia missed quota were March, April, and May of 2020.

84. During this time, New York was the epicenter of a global COVID-19 pandemic resulting in business closures and reduced spending which has made it extremely difficult to sell and start business.

85. Despite still being in the midst of the pandemic, Ms. Macchia was told that she was expected to sell four retail units and start a minimum of 50% of her quota in June 2020, or she would be fired.

86. ADP did not threaten others in her office with termination if they failed to meet quota during this period.

87. Only Ms. Macchia was subjected to elevated standards because she became pregnant, took maternity leave and complained about ADP's discriminatory practices.

88. When Ms. Macchia reviewed regional performance in her office March, April and May 2020, she found very few people were able to meet the metric that ADP was demanding of her.

89. Regarding retail units, in April 2020, fewer than 7 out 41 associates in her office started 4 or more retail units.

90. In the month of May 2020, fewer than 12 out of 41 associates hit this metric.

91. Regarding starting 50% of quota or more: In April 2020, 7 out of 41 associates hit this metric, and in May 2020, it was still less than half of the region who was able to reach 50% of plan.

92. The associates from Ms. Macchia's office who were able to hit both performance metrics simultaneously were 5 of 41 in April 2020 and 11 out of 41 in May 2020.

93. The performance targets provided to Ms. Macchia over the final three months of her employment have proven to be an impossibility for the overwhelming majority her office, and of the few associates who were able to start 4 or more units and 50% of their quota during these months, none of them had just returned from maternity leave upon the start of the pandemic.

94. Ms. Macchia's new manager Dana Cooper ("Cooper") did not raise any negative performance issues. In fact, the day before Ms. Macchia's termination she received a text and email from Cooper commending her for getting business started and sold up until the last

moments of the fiscal month of June.

95. ADP terminated Ms. Macchia on June 26, 2020.

## FIRST CAUSE OF ACTION
### (Pregnancy Discrimination a Title VII Violation)

96. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

97. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

98. By the actions described above, among others, Defendant discriminated against Plaintiff on the basis of her pregnancy, childbirth and/or related medical conditions in violation of Title VII by, *inter alia,* by treating her differently than her non-pregnant coworkers and terminating her employment because she had been pregnant and took maternity leave.

99. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## SECOND CAUSE OF ACTION
### (Retaliation a Title VII Violation)

100. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

101. By the actions described above, among others, Defendant has retaliated against Plaintiff by, *inter alia,* subjecting her to adverse employment actions, including terminating her employment, in violation of Title VII for complaining about pregnancy discrimination.

102. As a direct and proximate result of Defendant's unlawful and retaliatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## THIRD CAUSE OF ACTION
### (Pregnancy Discrimination in Violation of the NYSHRL)

103. Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

104. Defendants discriminated against Plaintiff on the basis of her pregnancy in violation of the NYSHRL by subjecting Plaintiff to disparate treatment based upon her pregnancy, including, *inter alia*, treating her differently than her non-pregnant coworkers and subjecting her to harassment and intimidation based on her status as a pregnant woman and a woman who had recently returned from maternity leave.

105. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

106. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)

107. Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

108. Defendant retaliated against Plaintiff on the basis of her protected activity in violation of the NYSHRL by subjecting Plaintiff to adverse employment actions because she engaged in protected activity, including, *inter alia*, subjecting Plaintiff to less favorable working conditions and termination.

109. As a direct and proximate result of Defendant's unlawful retaliatory conduct Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

110. As a direct and proximate result of Defendants' unlawful retaliatory conduct Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Cara Macchia demands that a judgment be entered in her favor and that the Court order and award Plaintiff the following relief against Defendant:

A. A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violates New York State and federal law;

B. An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate for all monetary and/or economic damages;

C. An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

D. An award of punitive damages in an amount to be determined at trial;

E. Pre-judgment interest on all amounts due;

F. An award of Plaintiff's reasonable attorneys' fees and costs; and

  G. Such other and further relief as the Court may deem just and proper.


Dated: Melville, New York  
   March 22, 2021          Respectfully submitted,

                 By: /s/ Troy L. Kessler  
                    Troy L. Kessler

                 **KESSLER MATURA P.C.**  
                 Troy L. Kessler  
                 Tana Forrester  
                 534 Broadhollow Road, Suite 275  
                 Melville, NY 11747  
                 Telephone: (631) 499-9100  
                 Facsimile: (631) 499-9120  
                 tkessler@kesslermatura.com  
                 tforrester@kesslermatura.com